SCLAFANI v PETER S CUSIMANO, INC

Docket No. 65543. Submitted July 27, 1983, at Detroit.—Decided December 5, 1983.

Salvatore and Marquerite A. Sclafani brought a negligence action in Wayne Circuit Court against Peter S. Cusimano, Inc., doing business as Piero's Fine Foods, alleging that Salvatore Sclafani had contracted hepatitis from eating in defendant's restaurant. Salvatore Sclafani consumed a piece of pie and several cups of coffee at defendants' restaurant on December 14, 1975. In early January, 1976, Salvatore Sclafani developed fatigue, nausea, and severe abdominal pain. While Salvatore Sclafani was originally diagnosed as suffering from type A hepatitis, further testing and the fact that he developed chronic hepatitis caused the diagnosis to be changed to type non-A non-B hepatitis. Plaintiffs' proofs established that a short order cook at defendant's restaurant experienced the onset of hepatitis symptoms on January 15, 1976, and was diagnosed as suffering from infectious hepatitis. There was no evidence introduced at trial as to which of the three types of hepatitis, type A, type B or type non-A non-B, was contracted by the cook. There was disputed expert testimony as to whether the cook suffered from type A hepatitis and whether Salvatore Sclafani could have contracted type non-A non-B hepatitis from contact with a. person who had type A hepatitis. Plaintiffs sought to have admitted the testimony of a person who allegedly contracted hepatitis in mid-December, 1975, after having eaten in defendant's restaurant in late November or early December, 1975. There was no evidence as to the type of hepatitis which this person suffered. The medical experts were all of the opinion that the testimony of this person would be minimally probative of the question of whether Salvatore Sclafani's hepatitis was contracted from contact with the cook. Patrick J. Duggan, J., refused to permit the testimony of the person who allegedly contracted hepatitis in mid-December on the basis that the probative value of the testimony was outweighed by its possible

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 30 Am Jur 2d, Evidence § 1080.
  75 Am Jur 2d, Trial § 127.

prejudice. The jury returned a verdict of no cause of action. Plaintiffs appeal. *Held:*

The trial court properly concluded that the possibility of unfair prejudice to defendant arising from the admission of the testimony of the other person who may have contracted hepatitis after eating at defendant's restaurant outweighed the minimal probative value of that testimony. The possible prejudice of that testimony was manifest, while there was little evidence to establish any probative value of that testimony on the question of whether Salvatore Sclafani contracted his hepatitis as a result of eating at defendant's restaurant.

Affirmed.

1. EVIDENCE — PREJUDICE — UNFAIR PREJUDICE — RULES OF EVIDENCE.

The concept of "unfair prejudice" as incorporated in the rule of evidence which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice involves more than that the evidence is "damaging" to a party's case; prejudice arises where there exists a danger that evidence which is minimally damaging when evaluated in a logical manner may be given weight by the jury substantially out of proportion to its logically damaging effect; unfair prejudice arises where the admission of prejudicial evidence would be inequitable (MRE 403).

2. EVIDENCE — PREJUDICE — ADMISSION OF EVIDENCE.

It is not error for a trial court to refuse to admit evidence where the probative value of the evidence is minimal and the possibility of prejudice is manifest (MRE 403).

*Martin, Bacon & Martin, P.C.* (by *Robert Patrick George),* for plaintiff.

*Joselyn, Rowe, Jamieson, Grinnan, Callahan & Hayes, P.C.* (by *James A. Callahan),* for defendant.

Before: R. M. MAHER, P.J., and WAHLS and R. R. LAMB,\* JJ.

R. R. LAMB, J. Plaintiffs instituted this lawsuit in the Wayne County Circuit Court, alleging that

\* Circuit judge, sitting on the Court of Appeals by assignment.

plaintiff Salvatore Sclafani[1] contracted hepatitis from eating in defendant's restaurant. Following the trial of this cause, the jury returned a verdict of no cause of action. Plaintiffs now appeal as of right.

In the early morning of December 14, 1975, plaintiff consumed a piece of apple pie and several cups of coffee at defendant's restaurant. In early January, 1976, plaintiff developed fatigue, nausea, and severe abdominal pain. Plaintiff was originally diagnosed as suffering from type A hepatitis. Following further testing, and because plaintiff developed chronic hepatitis which is not a sequelae of hepatitis A, plaintiff was diagnosed as being afflicted with hepatitis non-A non-B.

At the time plaintiff ate in defendant's restaurant, defendant employed David Roop as a short-order cook. Roop experienced the onset of hepatitis symptoms on January 15, 1976, and was diagnosed as suffering from infectious hepatitis. No evidence was introduced as to the type of hepatitis from which Roop suffered.

David Roop testified that his employment with defendant did not include the preparation or handling of pies. Roop did testify, however, that, if requested by a waitress, he would occasionally place a piece of pie which was already on its serving plate into the oven to warm. Roop denied having any contact with the silverware used by the restaurant's patrons. Roop further stated that he had no responsibilities in the preparation or service of coffee. Peter Cusimano corroborated this part of Roop's testimony and also testified that Roop was not present at the time plaintiff ate in his restaurant.

---

[1] References in this opinion to "plaintiff" in the singular refer only to Salvatore Sclafani.

Four doctors—Timothy Nostrant, Jorge Jamie Gumucio, Jane Polkowski, and Richard S. Mc-Caughey—offered testimony concerning the nature and varieties of hepatitis and the likelihood that plaintiff's hepatitis was contracted from Roop while he was working in defendant's restaurant. All the medical witnesses agreed that there are three recognized classifications of viral hepatitis.[2] Type A hepatitis is spread through human waste products. If a person with hepatitis A fails to wash his hands thoroughly after a bowel movement, that person may well spread the disease. Outbreaks of hepatitis A traceable to food handlers are well documented. Hepatitis A might also be spread through the sharing of a cigarette or kissing. Type B hepatitis is transmitted primarily through the blood or serum. Hepatitis B can also be spread by sharing "dirty needles", toothbrushes, razors, or through sexual intercourse. Little is known of hepatitis non-A non-B. Medical testimony offered at trial suggested that it could, in fact, encompass several viruses.[3] In the United States, hepatitis non-A non-B has been identified with blood or serum contact, and 90% of patients suffering from post-transfusion hepatitis suffer from type non-A non-B.[4]

When plaintiff contracted his hepatitis, medical knowledge of the disease was even more primitive. Today, tests exist which can identify both hepatitis

[2] The medical experts agreed that "hepatitis" means nothing more than inflammation of the liver. The medical experts also indicated that, in addition to the effect of viruses, the liver could become inflamed through toxins, chemicals, drugs, and bacterial agents.

[3] According to 4A Attorney's Textbook of Medicine, (3d ed), § 227.42, p 227-26, non-A, non-B hepatitis consists of at least two, and as many as five, different viruses. None of these viruses has yet been identified.

[4] Hepatitis B used to be most prevalent in patients suffering from the disease after transfusion. Now, however, a surface antigen test performed on the blood effectively screens out most blood which is contaminated with hepatitis B.

A and hepatitis B. Then, however, only a test to identify hepatitis B existed. The symptoms of hepatitis A and hepatitis non-A non-B are very similar, and many persons with hepatitis non-A non-B were originally diagnosed as suffering from hepatitis A, as was the case with plaintiff.

Drs. Gumucio, Polkowski, and McCaughey all testified that they did not believe plaintiff contracted his hepatitis from eating at defendant's restaurant. Each of these doctors stated that he or she was unaware of even one reported instance in the United States in which hepatitis non-A non-B was reported as being spread through foodstuffs.[5] While each of these doctors expressed skepticism that plaintiff contracted his hepatitis from defendant's restaurant, none of them would completely foreclose this possibility because of the absence of extensive medical knowledge of hepatitis non-A non-B.

In contrast, Dr. Nostrant, plaintiff's expert, stated that it was "highly probable" that plaintiff contracted the disease from Roop after eating in defendant's restaurant. Dr. Nostrant, without reservation, stated that hepatitis non-A non-B could be transmitted by consuming food handled by somebody who suffers from this variety of hepatitis. Dr. Nostrant initially testified that, if Roop suffered from hepatitis A, plaintiff's type non-A non-B hepatitis would not be related to Roop. Dr.

---

[5] Dr. Gumucio did testify that he had read of one epidemic in Costa Rica where the individuals were diagnosed as suffering from type non-A non-B hepatitis in which the affected individuals could not have had parenternal exposure to the virus, that is, exposure through inoculations or transfusions through the skin. Dr. Gumucio stated that this fact only indicated that the type non-A non-B virus could be transmitted through other routes. Dr. Gumucio believed that any other modes of transmission would probably closely parallel those for hepatitis B. Dr. Gumucio was skeptical that type non-A non-B hepatitis could be transmitted through foodstuffs or utensils, but would not rule this out on "theoretical grounds".

Nostrant immediately modified this view, however, and said that it would be "highly unlikely" that Roop's and plaintiff's hepatitis were related. After Roop was diagnosed in mid-January, 1976, as suffering from infectious hepatitis, the Wayne County Health Department contacted the local media to alert the public to the possible danger for those who had eaten in defendant's restaurant between January 1 through January 19, 1976, during the specific hours when Roop was in the restaurant. According to Dr. Polkowski, the Wayne County Health Department subsequently inoculated 1,172 persons against hepatitis A.[6] In addition, Dr. Polkowski discovered that three individuals who were diagnosed as having viral hepatitis in the period of December, 1975, through February, 1976, claimed to have eaten in defendant's restaurant. Only one of these three, Julie Underwood, was ever identified and located.

Dr. Polkowski further testified that, if Roop had hepatitis A, he would have been communicable only for two weeks before the onset of symptoms until two weeks after the onset of symptoms. Apparently, Roop's last day as a cook in defendant's restaurant came on January 19, 1976, and this is why the Wayne County Health Department was only concerned about people who had eaten in the restaurant through this date.

Julie Underwood was deposed. She testified that she had eaten in defendant's restaurant in either

[6] In fact, although this testimony did not directly come to the jury's attention, the inoculations were to protect against the hepatitis A virus. It was reported to the Wayne County Health Department that Roop suffered from hepatitis A. Dr. Polkowski indicated, outside the jury's presence, that the health department would not have issued the "same type of recommendations for a different hepatitis". In light of Dr. Polkowski's testimony, the reason for this is clear, namely, the belief that hepatitis B and hepatitis non-A non-B are not transmitted through foodstuffs.

late November or early December, 1975. She began to experience fatigue, nausea, and abdominal pain in mid-December, 1975, and sought medical treatment. Underwood had no personal knowledge as to what malady she suffered from at this time. She indicated that she had been told that she suffered from "infectious hepatitis",[7] although she had no recollection of being informed of a particular type of hepatitis.

Defendant moved *in limine* to exclude Underwood's testimony, arguing, *inter alia,* that this evidence was irrelevant and that its prejudicial impact substantially outweighed its probative value. Following arguments, the trial court ruled:

"Okay, this is one of those areas that is of difficulty to the court. We have had a reasonable amount of time to consider it. Counsel has been, has addressed this early in the trial so the court was aware that it was coming forward and the court is giving considerable thought to it, because I, I, at least, I hope to appreciate both party's positions to the case.

"I am going to—not—I am going to refuse to permit her to testify on this issue, because, number one, I think that the testimony that she contracted hepatitis in late November or early December, whatever she indicated she would testify to, is extremely prejudicial, and in this case, in this court's opinion, so far outweighs its probative value that its admission would result in an injustice. That isn't to say that it doesn't have some probative value. But I do not feel that what I have heard so far would indicate that its weight and reliability is so valuable that it would overcome the concern that I have that the jury may well say that since she got it there, he must have got it there, and that is not what the evidence is for. The evidence is not offered—I'm sure the plaintiff is attempting to offer— the fact that she acquired it there means that he did.

---

[7] Dr. Gumucio stated that the term "infectious hepatitis" most frequently is used to describe hepatitis A.

The circumstantial evidence would only point to the fact that there is contamination in the restaurant. Whether or not he got it is a circumstantial evidence, a circumstance that the jury would have to conclude.

"But I am concerned that the steps would go from one to the other, and that is that the fact that she got it there would be so influencing to the jury that they may not put it in the proper perspective."

The sole claim which plaintiffs raise on appeal is that the trial court erred in refusing to allow the admission of Underwood's testimony. The basis upon which the trial court excluded this testimony was that its probative value was "substantially outweighed by the danger of unfair prejudice". MRE 403. Although defendant argued below that the testimony was irrelevant, on appeal it concedes that the testimony has some minimal probative value.

"Unfair prejudice" does not mean "damaging". *Bradbury v Ford Motor Co*, 123 Mich App 179, 185; 333 NW2d 214 (1983). Any relevant testimony will be damaging to some extent. We believe that the notion of "unfair prejudice" encompasses two concepts. First, the idea of prejudice denotes a situation in which there exists a danger that marginally probative evidence will be given undue or pre-emptive weight by the jury. In other words, where a probability exists that evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect, a situation arises in which the danger of "prejudice" exists. Second, the idea of unfairness embodies the further proposition that it would be inequitable to allow the proponent of the evidence to use it. Where a substantial danger of prejudice exists from the admission of particular evidence, unfairness will usually,

but not invariably, exist. Unfairness might not exist where, for instance, the critical evidence supporting a party's position on a key issue raises the danger of prejudice within the meaning of MRE 403 as we have defined this term but the proponent of this evidence has no less prejudicial means by which the substance of this evidence can be admitted.[8]

In this case, the danger of prejudice by admitting Underwood's deposition testimony is manifest. No evidence was introduced to show the type of hepatitis from which either Roop or Underwood suffered. Although Dr. Nostrant suggested the contrary, most of the medical experts testified to the implausibility that hepatitis non-A non-B could be the result of eating contaminated food. Moreover, even Dr. Nostrant conceded that it was very unlikely that plaintiff's type non-A non-B hepatitis could have been transmitted by Roop, if Roop actually had hepatitis A. Roop's hepatitis was successfully treated, and, unlike plaintiff, he did not experience chronic liver failure, a situation which would be less likely if he and plaintiff suffered from the same non-A non-B hepatitis virus.

Of more importance, because the state of medical knowledge was such in early 1976 that hepatitis A was not readily distinguishable from hepati-

---

[8] Two comments are in order at this point. First, we do not imply that the courts will or should generally interfere with the method by which a party chooses to present his case. The courts may intervene, however, in extraordinary circumstances such as where a party has two or more methods of bringing a point to the jury and attempts to use a method which is prejudicial within the meaning of MRE 403. Second, a party who, prior to trial, had a reasonable means of presenting a particular point in a nonprejudicial fashion, but who chooses to adopt a prejudicial means of developing the point at trial, cannot claim that no less prejudicial method of presenting the substance of this evidence exists because, at the time of trial, it is too late to develop the strategy by which the point could be made in a nonprejudicial manner.

tis non-A non-B unless chronic liver failure resulted, are the separate records made of the testimony of Drs. Polkowski and McCaughey. Dr. Polkowski was asked whether her opinion that there was not a connection between Roop's and plaintiff's hepatitis would be different if she also took into account that Underwood and two others who purportedly ate at defendant's restaurant contracted hepatitis in the three-month period of December, 1975, through February, 1976. Given differences in onset dates of the maladies and the size of the sample, Dr. Polkowski concluded that there was no statistical significance between the reported cases of hepatitis and defendant's restaurant. Counsel's repeated efforts to get Dr. Polkowski to state that the other reported instances of hepatitis affected her view concerning the lack of a relationship between plaintiff's and Roop's hepatitis were unavailing and ended with the following exchange:

"A. But, absent any thread to tie them together other than Piero's, doesn't the fact that instead of just one, you have two, and instead of two, you have now three, and instead of three, we have now four, make some significance to you, in your opinion, if there is no other thread in your records that tie these people together at all, if the only common denominator with reference to all of the people is Piero's—

"A. (Interposing): I'm sorry, I really disagree with you, I disagree with you."

With respect to the significance of the other reported instances of hepatitis, the following colloquy occurred between the court, Dr. McCaughey, and plaintiffs' counsel:

"The Court: And that the fact that we are concerned

with now is the fact in the report that three other people reported they ate at the restaurant in late November or early December and those three people were initially diagnosed as type "A" back in 1975. Given that information, does that in any way change or modify your opinion that was stated here in court, that it is unlikely that Mr. Sclafani contracted the disease from the cook?

*"The Witness:* I think it is unlikely, sir.

*"The Court:* Do those facts change your opinion in any way?

*"The Witness:* They would change [my] betting in Las Vegas a tiny bit, but it doesn't change my opinion that it is unlikely that that is where he got it.

*"Mr. Martin:* Your Honor, that is the point. I am not trying to suggest that it changes his opinion. I think it is a proper area of cross-examination as long as he has indicated, however slight it may be, that the possibility of my client having contracted that disease is affected, his opinion is affected, however slightly, by the fact that those other people did. He knew about it and considered it. And it weighed. I mean, he may have said that it absolutely was impossible that he could have obtained that disease, notwithstanding the others. And with the other three being present, it may now be very unlikely but nevertheless possible. And that is the point of it. That if, if it in any way affects his opinion to reduce either the total negative of it, or to increase the probability of it in the other direction, I think that it is proper cross-examination in that respect. And I think that the doctor is being entirely candid with this in saying that it has, to a limited degree, affected, or at least it was taken into consideration, in affecting his opinion."

Plaintiffs did not offer to present any medical or statistical evidence which would suggest that any greater significance could be attached to the other reported instances of hepatitis by purported patrons of defendant's restaurant than that suggested by Dr. McCaughey. Moreover, plaintiffs on appeal do not even contend that the jury should

have been informed of the other three reported hepatitis cases but, rather, contend only that Underwood, herself, should have been allowed to testify. Clearly, if three additional instances of hepatitis between December, 1975, and February, 1976, in persons who had eaten at defendant's restaurant were, at best, only minimally probative of a connection between the restaurant and plaintiff's hepatitis, testimony from one of these persons (namely, Underwood) is even less significant.[9] Given all of the circumstances, the trial court's conclusion that Underwood's testimony would likely be relied upon by the jury in disproportion to its fairly minimal probative value was well within the parameters of reasoned opinion.[10] On the facts of this case, we conclude that the trial court did not err in deciding that it would have been unfair to the defense to admit Underwood's testimony. Beyond what they could get from Dr. McCaughey, plaintiffs simply failed to offer any proof that, because Underwood ate at defendant's restaurant and later developed hepatitis, it was more likely that plaintiff's hepatitis was related to the restaurant.

Affirmed. Defendant may tax costs.

---

[9] There is a facile attraction to plaintiff's argument largely because the incidence of hepatitis is relatively low. One is likely to be impressed on an intuitive level by the fact that Underwood or Underwood and two others ate at defendant's restaurant and later came down with hepatitis, as did plaintiff. In the absence of hard evidence that this intuitive reaction is actually substantially justified, however, it is clear that any probative value of such evidence is substantially outweighed by the danger of prejudice. This is particularly true here where the only testimony on this point was to the effect that the other cases of hepatitis were of no or very minimal significance.

[10] On appeal, plaintiffs object to judicial consideration of the weight of the evidence, asserting that how much weight a piece of evidence should be given is for the jury. Clearly, however, MRE 403 implicitly assumes the existence of situations in which the courts may properly consider the weight of the evidence. Indeed, MRE 403 could not exist in its current form if judicial balancing of the proffered evidence's weight was impermissible.